The opinion of the court was delivered by
Maer, J.
By act 68, of 1878, p. 105, the Legislature authorized and *1218 required the Governor to issue to the New-Orleans Pacific Railway Com•pany bonds of the State, to be signed by him and countersigned by the • Auditor and the Secretary of State, with the seal of the-State affixed, to an amount not exceeding two millions of dollars, to be for one thousand dollars each, having forty years to run, bearing interest at six per cent per annum, payable semi-annually, and having semi-annual coupons attached.
. ’ Section 2 of this act, as a guarantee for the prompt payment of the interest on these bonds, as it shall mature, and of the principal, on or before the expiration of the period during which they are to run, requires the railway company to deposit with the Auditor of Public Accounts, and to pledge to the State for that purpose its bonds, secured by first mortgage of all its property, real and personal, present and future, such deposit and pledge to exceed by one fourth, in each case, the amount of the State bonds delivered to the company.
“The said company, on resolution- of its board of directors, is authorized to make such a mortgage, and the same shall cover and ' affect as a first mortgage all property of said company, whether real or personal, present or future, now owned or hereafter acquired, and whether now constructed or hereafter constructed. The amount of bonds secured by said mortgage shall not exceed five millions of dollars, it being intended that one half of the same may be pledged to the State, as aforesaid, and the other half disposed of to other parties. The said mortgage bonds shall have forty years to run; shall bear interest at six per cent per annum; shall have semi-annual coupons attached, and said coupons shall fall due at or prior to the time at which the coupons of the said State bonds shall fall due; and the interest paid on its bonds by the company to the State as pledgee shall at once form a fund and be used to pay the interest on the State bonds which shall have been ■ issued to the company.
“ The said company shall further bind itself in said pledge to extinguish annually fifty thousand dollars of said State bonds, commencing live years after the completion of its line to Shreveport, and continue the extinguishment at such annual rate up to five years prior to the maturity of said State bonds; and during the last five years it shall, under the same pledge, agree to take up and extinguish one fifth each year of the amount of said State bonds then outstanding.”
Section 3 makes it the duty of the Auditor or other officer having custody of the mortgage bonds pledged by the company, when a sufficient sum is not provided by the company to meet a maturing coupon, to sell at public auction after ten days advertisement a sufficient amount of the mortgage bonds to pay such maturing coupon and the expenses of the sale.
*1219 Section 4 requires the issue of two hundred and fifty State bonds immediately on the going into effect of this act. Subsequent issues, up to the amount limited, are to be at the rate of ten thousand dollars per mile for every section of ten miles of the road graded, bridged, and metaled.
This act was approved eleventh March, 1878; and it went into effect from its passage: and, shortly after, the company demanded the bonds for $250,000. The Governor doubted the constitutionality of the act; •and the question was finally determined by this court, by a decree which declared the act to be not in violation of the constitution of th^ State. See the case, 30 An., not yet published.
On the first March, 1878, before the passage of this act, the company, by authority of a resolution of the board of directors, adopted on the sixteenth August, 1877, and of the acts of the Legislature, No. 14, of 1876, p. 28, and No. 12 of 1878, p. 37, confirming and amending the notarial charter, executed a first mortgage of all its property, real and personal, present and future, and its rights and franchises, to secure principal and interest of five thousand bonds, of one thousand dollars each, payable in New-Orleans or New York, at the option of holders, having forty years to run, bearing six per cent interest, payable semi-annually, with coupons attached, with waiver, in the act of mortgage, “ of the benefit of any extension, or stay, or appraisement laws now existing, or which may hereafter exist, in the States of Louisiana and Texas.”
By another clause in the act of mortgage it is expressly stipulated that “if the company, or its successors or assigns, shall, at anytime hereafter, after demand made, make default, or neglect, or refuse, or omit to pay the semi-annual interest on said bonds, or any of them, when the same shall become due, and if any such default shall continue for the period of six months, then, upon demand of any holder of any one or more of said bonds, the whole principal sum of each and all the bonds then outstanding, and intended to be hereby secured, shall forthwith become due, exigible, and payable.”
On the thirty-first May, shortly after the decision of this court de•claring the act of eleventh March, 1878, constitutional, the company tendered a notarial act pledging three hundred and thirteen of these bonds, and embodying the terms and conditions of section 2, of the act of eleventh March; and it demanded the issue and delivery of two hundred and fifty State bonds. The Governor was not satisfied with the terms and conditions of the bonds of the company and of the act of mortgage; and he declined to deliver the bonds of the State as demanded. Thereupon the company brought suit against the Governor, the Auditor, and the Secretary of State, to compel, by mandamus, compliance with its demand.
*1220 The answer alleges that the company has not complied with the obligations imposed upon it by law, conditions precedent to the delivery of the bonds of the State: “ Nor has the relator placed the State in the situation in which she is directed to be placed, by law, before any of the bonds authorized to be issued by act No. 68, of 1878, can be issued.
“ Respondents are public officers, with limited powers, acting under a special law, and are not authorized to vary from it, or exercise any discretionary power in the matter.”
Respondents specially object to the stipulation in the bonds making-them payable in New York at the option of holders; and to the clauses in the act of mortgage waiving the benefit of appraisement, and making the whole of the outstanding bonds due, exigible, and payable on the failure of the company to pay the interest due at any time for the space of six months: and they allege that “these variations from the law are of the most serious character, and will greatly injure the State, in view of the fact that the relators have disposed, or are authorized to dispose, to other persons than the State, of two millions and a half of similar bonds, secured by similar mortgage.”
The district court refused to grant the mandamus as prayed for, mainly' on the ground of want of authority to interfere with the discretion of the Governor; and the company appealed.
The Attorney General informs us, in his oral argument, that the Governor desires to make no question as to whether his power in reference to the issuing of these bonds is discretionary; nor as to the authority of the judicial tribunals to control him in the performance of his official duties. The Auditor and the Secretary of State, parties appellees, are charged with important functions with respect to the issuing of these bonds; and the judiciary has unquestioned power, in proper cases, to compel them to perform the ministerial duties absolutely required'of them, respectively, by law. We shall proceed, therefore, to consider the case, without reference to our authority to deal judicially with the-Governor, premising that judicial power is the creature of the law; and that it can not be enlarged by mere consent.
It is of no consequence that the bonds of the company, and the mortgage to secure them, are dated first March, 1878, anterior to the passage of the act of eleventh March, provided they meet the requirements of that act. By the acts of 1876, p. 28, and 1878, p. 37, and the resolution of the board of directors of sixteenth August, 1877, the company was fully authorized to issue its bonds to the amount of five millions, and to secure them by mortgage and pledge. Their validity is not. affected by the date; since the bonds are not obligatory, and the mort.gage and pledge are not operative until the bonds are actually issued. The terms of the mortgage are such that it secures any holder as effect *1221 ■ually as if he had been an original contracting party, a mortgagee. It would not have been unwise for the company to have deferred the execution of the bonds and the mortgage until the act of eleventh March had become a law, in order to have made them in conformity with its terms and conditions.
Equally unimportant is it that the bonds are made payable in New 'Orleans or New York, at the option of holders, since their value as security to the State is in no manner thereby diminished, and their market value may be enhanced.
The serious question is whether the waiver of the benefit of appraisement, and the clause in the act of mortgage by which the whole of the outstanding bonds may become due and exigible at any time at the will of any holder of even one of them, by the failure of the company for six months to pay the interest due, impair the value of the ■security contemplated and required by the Legislature, as a pledge and /guarantee upon which the aid of the State is to be given to the company; whether these clauses in the act of mortgage are not a variation, ■a departure from the terms prescribed by the Legislature, by which the peril and liability of the State are increased beyond the risk which the Legislature intended and consented to incur.
The Legislature had the right to prescribe the terms and conditions, upon which the aid of the State should be granted to the company. A ■■gratuity, a donation to the company was not intended; and it was the •duty of the Legislature to see that the credit of the State, which it designed and consented to lend to the company, should be fully secured and protected. The mere reading of the act will show how carefully it ■seeks to accomplish this purpose. The amount of the first-mortgage bonds of the company is limited, and is small compared with the cost of -constructing the entire road; and one half only of those bonds is to be put upon the market, the other half to be reserved to be pledged to the State. These bonds are to have the same period to run as the bonds of -the State: they are to bear the same rate of interest, payable semi•■annually, at or prior to the time at which the interest on the State bonds will be exigible. When bonds of the State are issued to the company, the bonds of the company, for an amount exceeding by one fourth the amount of the State bonds so issued, are to be deposited with the Audit- or of Public Accounts, and be pledged to the State, secured by first ■mortgage on all the property of the company, present and future; and -to secure the State against the inconvenience of advancing even the semi-annual interest on its bonds, the officer of the State having the •custody of the pledged bonds of the company is required to sell, on short notice, a sufficient amount of them to make good any deficiency cr failure of the company to provide for the maturing coupons.
*1222 Again; the company is required to extinguish annually fifty thousand dollars of the bonds of the State, commencing five years after the-completion of the road to Shreveport; and, during the last five years of the running of the bonds, to extinguish, annually, one fifth of the remainder outstanding. It was not the intention of the Legislature to tax the overburdened people of the State by giving, or advancing temporarily, a single dollar to the company; and while it was deemed proper to aid the company in its great enterprise, the importance of which is-so manifest, by lending the credit of the State to secure the early completion of the road within the limits of the State, the terms and conditions upon which this assistance is to be granted are such that a compliance with them by the company would save the State from loss, or even inconvenience.
It must be assumed, as there is nothing in the act of eleventh March indicating a different purpose or intention, that the Legislature contemplated and designed that the mortgage and pledge should be, in all respects, in conformity with and should subject the property to the-existing laws of the State. By the existing laws the property of the debtor can not be sold for cash for less than two thirds of its value, as fixed by two sworn appraisers, one of whom may be selected by the-debtor, the other by the creditor. If two thirds of the appraised value-should not be bid, the property may be re-advertised and sold for whatever it will bring on twelve-months credit.
This is considered a wise regulation, since it prevents the sacrifice-of the property, and protects the creditor, who may not be able or willing to buy it for cash, against a sale which would be prejudicial to him by the insignificance of the price. The importance of this provision of the law can not be overestimated in this case, when it is considered in connection with the clause in the mortgage by which the entire mortgage debt may become due and payable, and the mortgaged property may be forced upon the market at any time, however unpropitious.
The clause by which the mortgage bonds may become due and exigible before the expiration of the forty years may be attributed to the difference between our law and the systems prevailing in the other States of the Union, with respect to the enforcement of mortgage rights ~ and to the fact that the.principal market for railway bonds is the great commercial emporium where our system is comparatively unknown. Under the system prevailing in the other States, generally, a mortgage-can not be foreclosed and the mortgaged property sold until the whole mortgage debt is due and exigible; and there is no doubt that the object of the company in inserting this clause was to enhance the market value of the disposable half of these bonds, by conforming to the usual stipulation in railway mortgages in the other States, by which the pune *1223 tual payment of the interest is secured, under penalty of the immediate maturity of the entire mortgage debt, and the speedy foreclosure of the mortgage, and sale of the mortgaged property. No doubt this stipulation adds to the market value of the bonds; but the usual consequence is that the mortgaged property is sacrificed; and the holders of the bonds combine and become the owners of the property and franchises of the company.
Under our system it is not necessary for the mortgage creditor to wait until the entire mortgage debt is due. If any part of it be due he may proceed by executory process, without citation of the mortgagor, on an ex-parte order of the competent judge, in term or at chambers, under ' which the entire mortgaged property may be sold, within less than sixty days, for such sum in cash as will satisfy the matured debt, and the costs, and on terms of credit corresponding with the maturity of the remainder, which, to the extent of the price bid the purchaser, must assume and pay as it shall mature.
Under this system mortgage securities, having a long term to run, may not be so attractive to large dealers as they would be under a contract which would authorize any holder to have tne mortgaged property sold for cash, at any time, for the entire mortgage debt. But the State of Louisiana consented to advance its bonds to this company on terms and conditions which would be defeated by the maturing of the bonds of the company, and the forced sale of the mortgaged property for cash, at any time before the extinguishment of the bonds of the State. It was-not the object of the Legislature to enable holders to hasten the maturity of these bonds, nor to furnish the means of having the mortgaged property speedily sold for cash at whatever price. The entire purpose and design of the act of eleventh March was to provide a fund to meet punctually the current interest as it should accrue, and to insure the final payment and extinguishment of the two millions of accommodation bonds of the State having a period of forty years to run. The Legislature intended that the bonds of the State should be protected by the precise security prescribed in the act, leaving, that portion of the bonds of the company put upon the market to stand upon their own merits: and while the State could not avoid the risk of a sale of the whole of the mortgaged property to pay the entire mortgage debt, in the event of the failure of the company, at any time, to pay the semiannual interest, on the disposable half of the bonds, a sale in accordance with our law for cash to meet the matured part of the debt, and oh terms of credit corresponding with the part of the debt to mature, principal and interest, according to the tenor of the bonds, would be far less prejudicial to the State than a sale for cash without appraisement.
Under our system the rights of holders, especially those who seek *1224 permanent investments in mortgage securities, are better protected than they would be under a contract by which the entire mortgage debt may’ become due, on the failure of the mortgagor to pay the current interest as it matures, and the whole of the mortgaged property be sold for cash without appraisement. Such an accessory contract abrogates the principal contract as expressed on the face of the bonds; while our system respects the contract as thus expressed, and enforces it, as nearly as possible, by divesting the title and possession of the defaulting mortgagor, and subjecting the purchaser to his obligations, and making him pajunaster, to the extent of the price, in lieu of the original mortgngor. Under our system no express stipulation in the mortgage is necessary to enable the holder of any part of the mortgage debt to enforce the payment of whatever may be actually due, as well to himself as to other holders; and the mortgagor can not be crushed by the hastened maturity of the entire debt, which he contracted and intended to pay at the expiration of a long term.
It may be difficult, as urged by counsel for appellant, to negotiate the bonds of the company without a mortgage containing the clauses under consideration; but we can see no good reason for this, since our law affords every requisite facility for the enforcement of mortgage rights by process exceptional, speedy, and summary. It may be that these clauses are usual in railway mortgages of recent date in this and in' other States. Individuals and corporations contracting in their own right for tlreir own interest alone may make such stipulations and agreements as they think proper; and capitalists will judge and determine for themselves whether the security upon which they are invited to invest is satisfactory and such as they require. But those who contract with a sovereign State must submit to the terms which it chooses to prescribe; and when the Legislature, in an act so precise and minute in its details as that of eleventh March, 1878, declares the terms and conditions on which the State shall bind itself, there is no other department of the government that can change these terms and conditions, or undertake to say that any thing short of a strict compliance with them would meet and satisfy the requirements of the law.
The Legislature chose to require, for the security of the State, that the first-mortgage bonds of the company should have forty years to run, without qualification; and when the company agreed that these bonds, nominally having forty years to run, should, on failure to pay the interest, become immediately due and exigible, this was a qualification which the Legislature had not chosen to express in the act: which, for all that appears, was never submitted to the consideration of the Legislature; and to which the Legislature has not in any manner consented.
The officers whose duty it is, by the act of March 11, to execute and *1225 ■deliver to the company the bonds of the State for two millions have no power or authority to accept any other or different security than that required by the express terms of the act. The Governor, the Auditor, and the Secretary of State, defendants and appellees in this case, well said in their answer: “We are public officers, with limited powers, acting under a special law, not authorized to vary from it, or exercise any discretionary power in the matter.”
The judge of the district court did not err in refusing the mandamus; and the judgment appealed from is therefore affirmed with costs.